22-50316

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

**UNITED STATES OF AMERICA,**

                                             **Plaintiff-Appellee,**

v.

**JOHN THOMAS FENCL,**

                                             **Defendant-Appellant.**
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA (3:21-cr-03101-JLS)
_____

**BRIEF OF *AMICI CURIAE* NINTH CIRCUIT FEDERAL
PUBLIC AND COMMUNITY DEFENDERS IN
SUPPORT OF DEFENDANT-APPELLANT**
_____

| | |
|---|---|
| JODI LINKER | JON M. SANDS |
| Federal Public Defender | Federal Public Defender |
| Northern District of California | District of Arizona |
| | |
| CARMEN SMARANDOIU | DANIEL L. KAPLAN |
| Appellate Chief | Assistant Federal Public Defender |
| 450 Golden Gate Ave., 19th Floor | 850 West Adams Street, Suite 201 |
| San Francisco, CA 94102 | Phoenix, Arizona 85007-2730 |
| (415) 436-7700 | (602) 382-2767 |

**TABLE OF CONTENTS**

**PAGE**

Table of Authorities..................................................................................................ii

Interest of Amici Curiae..........................................................................................iv

Introduction.............................................................................................................. 1

Argument..................................................................................................................2

    I.    The Court should be wary of efforts to satisfy *Bruen*'s historical test that seek to draw historical analogies at an excessively high level of generality… ........................................................................................2

    II.    The Court should recognize the applicability of precedent requiring conditions that infringe upon significant liberty interests to be justified by on-the-record, evidence-based findings of necessity..........6

Conclusion ............................................................................................................ 12

Certificate of Compliance

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Betterman v. Montana*, 578 U.S. 437 (2016) ................................................................9

*District of Columbia v. Heller*, 554 U.S. 670 (2008) ............................................. 1, 10

*Imbler v. Pachtman*, 424 U.S. 409 (1976) .................................................................10

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) .............................................................5

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..................................................10

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) .........*passim*

*Range v. Attorney General*, 53 F.4th 262 (3d Cir. 2022) ....................................... 2–3

*Range v. Attorney General*, No. 21-2835 (3d Cir.) .....................................................3

*Riggins v. Nevada*, 504 U.S. 127 (1992) .....................................................................7

*Sell v. United States*, 539 U.S. 166 (2003) .................................................................7

*Stack v. Boyle*, 342 U.S. 1 (1961) .............................................................................10

*United States v. Bare*, 806 F.3d 1011 (9th Cir. 2015) ................................................8

*United States v. Collins*, 684 F.3d 873 (9th Cir. 2012) ..............................................8

*United States v. Cope*, 527 F.3d 944 (9th Cir. 2008) .................................................8

*United States v. Lopez*, No. 21-cr-69 (D. Mont.) ..................................................... 11

*United States v. Mosmiller*, No. 21-cr-84 (D. Mont.) .............................................. 11

*United States v. Napulou*, 593 F.3d 1041 (9th Cir. 2010) ..................................... 8, 10

*United States v. Scott*, 450 F.3d 863 (9th Cir. 2006) .................................................9

*United States v. Uziewe*, No. 20-cr-196 (E.D. Cal.) .................................................. 11

*United States v. Weber*, 451 F.3d 552 (9th Cir. 2006) ................................................8

*United States v. Williams*, 356 F.3d 1045 (9th Cir. 2004) .....................................6-10

*United States v. Wolf Child*, 699 F.3d 1082 (9th Cir. 2012) ................................ 8, 10

*Washington v. Harper*, 494 U.S. 210 (1990) .............................................................7

**Statutes**

18 U.S.C. § 3142(c)(1)(B) ......................................................................................9, 11

18 U.S.C. § 3583(d)(1) .................................................................................................8

18 U.S.C. § 3583(d)(2) .............................................................................................7, 9

**Interest of Amici Curiae**

The Ninth Circuit Federal Public and Community Defenders represent indigent criminal defendants in this Circuit. Amici represent individuals in the position of John Thomas Fencl—on pretrial release pursuant to conditions that include a ban on firearm possession—on a regular basis. More broadly, amici represent individuals charged with firearms-related offenses on a daily basis, and in these cases they often litigate Second Amendment issues. Amici and their clients thus have a strong interest in the manner in which this Court construes and applies *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which is at the heart of Mr. Fencl's challenge.

No counsel for either party authored this brief in whole or in part. No person other than amici or their offices contributed money that was intended to fund the preparation or submission of this brief. Both parties have consented to the filing of this brief.

**Introduction**

*Bruen* redrew the map of Second Amendment litigation. It discarded much of the Circuits' caselaw addressing Second Amendment challenges in the wake of *District of Columbia v. Heller*, 554 U.S. 570 (2008), and articulated a historically based protocol for applying the Second Amendment—a protocol in which means-end scrutiny and interest-balancing play no role.

As the Court begins to apply *Bruen*'s test, amici caution against a troublesome trend in Second Amendment litigation. In this and other cases, the government has sought to satisfy *Bruen*'s test by analogizing challenged firearms regulations to purported historical practices that it describes at extremely high levels of generality—*e.g.*, historical measures disarming people the sovereign deemed "dangerous" or "disruptive." The Court should take heed of *Bruen*'s emphatic rejection of such broad analogizing and insist that the government demonstrate that challenged regulations are consistent with a narrow, well-defined historical tradition. Employing the proper inquiry here, the Court should hold the government failed to demonstrate that the Southern District of California's standard pretrial firearms ban, as applied to Mr. Fencl, is distinctly similar to any narrowly defined historical tradition.

The Court should also recognize the applicability here of a body of its caselaw that developed outside the Second Amendment context, but has full application within it: the line of cases requiring a condition that infringes upon significant constitutional liberty interests to be justified by on-the-record, evidence-based findings that the condition is adequately justified and no more restrictive of

those interests than necessary to accomplish the statutory objectives. The Court should hold that, in addition to contravening *Bruen*, the district court erred by failing to make on-the-record, individualized, evidence-based findings that the no-firearms condition was necessary to ensure Mr. Fencl's appearance at trial and/or to protect the community.

## Argument

**I.     The Court should be wary of efforts to satisfy *Bruen*'s historical test that seek to draw historical analogies at excessively high levels of generality.**

As this Court begins to apply the principles of Second Amendment analysis articulated by the Supreme Court in *Bruen*, it should be wary of a mode of historical argument that the government has consistently pressed in Second Amendment cases. In many cases—including before the district court in the instant case—the government has sought to analogize laws burdening the Second Amendment right to a purported historical tradition of restricting the gun rights of certain groups viewed by legislatures as "dangerous" or "disruptive." D. Ct. Doc. 79 at 12–13.

In pressing this argument below, the government relied on the decision of a Third Circuit panel in *Range v. Attorney General*, 53 F.4th 262 (3d Cir. 2022). The *Range* panel purported to identify a historical tradition of disarming "individuals whose conduct indicated a disrespect for the sovereign and its dictates"—a category the panel described as having included non-Anglican Protestants, Catholics, Antinomians, Quakers, "anyone who defamed resolutions of the Continental Congress," and persons who failed to take oaths of allegiance to their

respective colonies. *Id*. at 274–79. From such disparate regulations, the government attempted to deduce a broad historical tradition of regulating any group that a legislature considers "dangerous" or "disruptive"—regardless of whether that group was disarmed at the founding.

On January 6, 2023, the Third Circuit voted to vacate the *Range* panel's opinion and rehear the case en banc. Remarkably, the court refused to extend the rehearing petition deadline and entered its en banc order a mere three days after the rehearing petition was filed—without requesting a response from the government. *Range v. Attorney General*, No. 21-2835 (3d Cir.) (DktEntries: 64, 68, 69). The Third Circuit's eagerness to rehear the case may relate to the fact that the sort of broad-brush analogizing that characterizes the *Range* panel's opinion—as well as the government's argument below—clearly flouts *Bruen*. Contrary to the panel's holding, *Bruen* instructs that in carving out exceptions to "the Second Amendment's unqualified command," 142 S. Ct. at 2126 (internal quotation marks omitted), courts should proceed cautiously, defining those exceptions narrowly to ensure they are consistent with the Nation's historical tradition of firearms regulation.

*Bruen* itself modeled this cautious approach. There, New York argued that its challenged regulation, which conditioned public-carry licenses on the applicant's ability to show "proper cause" by identifying a special need for self-protection distinguishable from that of the general community, fell within a historical governmental power to regulate the public carrying of firearms. To

support that claim, New York compared its proper-cause requirement to four types of regulation.

(1) *"Sensitive places" laws*. These laws prohibited carrying firearms in legislatures, polling places, and courthouses—and New York argued that its law similarly restricted public carry in "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id*. at 2133. The Court rejected that overgeneralization, explaining that, by "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement," New York "define[d] the category of 'sensitive places' far too broadly." *Id*. at 2134.

(2) *The Statute of Northampton*. This law outlawed "bring[ing] . . . force in affray of the peace" and carrying armor or unusual weapons in public. *Id*. at 2139–40 (internal quotation marks omitted). The Court was unpersuaded, noting that this law "appear[ed] to have been centrally concerned with the wearing of armor," and refusing to infer from it that the government enjoys the power to pass "onerous public-carry regulations." *Id*. at 2139–40.

(3) *19th century statutes proscribing the concealed carry of certain weapons*. The Court rejected this analogy as well, noting that these regulations could not justify New York's "general prohibition" on concealed *and* open public carry. *Id*. at 2146–47.

(4) *Surety statutes*. These laws required certain individuals to post bond before carrying weapons in public. *Id*. at 2148. But "these laws were not *bans* on public carry"—they only conditioned public carry on the posting of a bond—and

"they typically targeted only those threatening to do harm." *Id*. As such, they could not validate a proper-cause requirement applicable to *all* New Yorkers.

Thus, while acknowledging that the right to keep and bear arms in public has traditionally been subject to certain "well-defined restrictions," *Bruen* rejected New York's argument that its collection of discrete historical regulations amounted to a tradition of broadly prohibiting public carry, or of conditioning it on a special need for self-defense. *Id*. at 2156.

There is good reason to insist on a close fit between the government's asserted regulatory authority and its proffered historical analogies. "The government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun." *Kanter v. Barr*, 919 F.3d 437, 465 (7th Cir. 2019) (Barrett, J., dissenting). Moreover, it is unclear how courts could meaningfully review a legislature's determination that certain individuals fit within such amorphous categories as "dangerous" and "unvirtuous"—and even if they could, such review would necessarily devolve into the sort of "interest-balancing" that *Bruen* rejected. *Bruen*, 142 S. Ct. at 2129–31.

In short, this Court should be extremely wary of attempts to satisfy *Bruen*'s historical test by identifying historical analogies from 30,000 feet, rather than requiring the narrow and concrete relationship that the Supreme Court described.

5

**II. The district court's affirmance of the no-firearms condition violated this Court's precedents requiring conditions that infringe upon significant constitutional liberty interests to be justified by on-the-record, evidence-based findings of necessity.**

Mr. Fencl has shown, applying the proper type of historical analysis, that the district court's justifications for leaving the no-firearms condition in place cannot be reconciled with *Bruen*. DktEntry: 6 (Mem.). Amici agree fully with that argument. Amici write separately to observe that, in addition to running afoul of *Bruen*, the district court's analysis flies in the face of a broader principle set forth in this Court's precedent: When imposing a condition that infringes upon an individual's significant constitutional liberty interest, a court must support the condition with on-the-record, evidence-based findings that the condition is both adequately justified and no more restrictive than necessary to achieve the pertinent statutory objectives.

In *United States v. Williams*, 356 F.3d 1045 (9th Cir. 2004), this Court reviewed a supervised release condition imposed upon a defendant who pleaded guilty to transmitting a threatening communication. *Id.* at 1046–47. The condition required the defendant to take "psychotropic and other medications prescribed for him by physicians treating his mental illness." *Id.* at 1047 (footnote omitted). Defendant's counsel objected, pointing to "the liberty and due process interests recognized by the Supreme Court in its involuntary medication decisions," and to the absence of evidence that defendant was dangerous when unmedicated. *Id.* at 1050. The district court overruled the objection and imposed the condition

6

"without addressing counsel's constitutional arguments or any potentially less restrictive conditions." *Id.* at 1051.

This Court held this to be an abuse of discretion, noting that the district court had failed to find that the condition "involve[d] no greater deprivation of liberty than [wa]s reasonably necessary" to achieve the purposes of supervised release. 18 U.S.C. § 3583(d)(2); *Williams*, 356 F.3d at 1052–57. The Court stressed that this failure was of "particular importance" in light of the "unusual significance" of a defendant's constitutional liberty interest in avoiding mandatory use of antipsychotic medication. *Williams*, 356 F.3d at 1053. The Court rested this observation on Supreme Court cases addressing challenges to the forcible administration of antipsychotic medication at three different stages of the criminal process: (1) during pretrial detention, *Sell v. United States*, 539 U.S. 166 (2003); (2) during trial, *Riggins v. Nevada*, 504 U.S. 127 (1992); and (3) during service of sentence, *Washington v. Harper*, 494 U.S. 210 (1990). *Williams*, 356 F.3d at 1053–54.

Because the Supreme Court had made plain that "[b]oth convicted prisoners and pretrial detainees 'possess[] a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment,'" *id.* at 1053 (*quoting Harper*, 494 U.S. at 221–22), this Court set aside its general tolerance of a district court's failure to "articulate on the record at sentencing the reasons for imposing each [supervised release] condition." *Id.* at 1055 (internal quotation marks omitted). The Court held that when imposing this condition, a district court must make "on-the-record,

7

medically-grounded findings that court-ordered medication is necessary to accomplish one or more of the factors listed in § 3583(d)(1)," as well as "an explicit finding on the record that the condition 'involves no greater deprivation of liberty than is reasonably necessary." *Id*. at 1055–57.

*Williams* findings have since been required in a series of cases reviewing infringements on other "particularly significant liberty interests." *See*, *e.g.*, *United States v. Weber*, 451 F.3d 552, 566–70 (9th Cir. 2006) (interest in being free from penile plethysmograph testing); *United States v. Cope*, 527 F.3d 944, 952–56 (9th Cir. 2008) (interest in being free from compulsion to take any medication implicating a particularly significant liberty interest); *United States v. Napulou*, 593 F.3d 1041, 1046–48 (9th Cir. 2010) (interest in associating with "life partner"); *United States v. Wolf Child*, 699 F.3d 1082, 1092 (9th Cir. 2012) (interest in associating with supervisee's own children). The Court has further held that a district court's failure to comply with *Williams*' "enhanced procedural requirement" constitutes plain error. *Wolf Child*, 699 F.3d at 1094–95. And the Court has found express findings necessary even with respect to conditions that infringe upon liberty interests that it did not identify as "particularly significant." *See*, *e.g.*, *United States v. Bare*, 806 F.3d 1011, 1017 (9th Cir. 2015) (computer-search supervised release condition required "a factual finding establishing some nexus between computer use and one of the goals [of supervised release]"); *United States v. Collins*, 684 F.3d 873, 889–92 (9th Cir. 2012) (supervised release condition effectively preventing releasee from living in any urban area required an "analysis of the basis therefor").

8

Although the Court has commonly applied the *Williams* principles to conditions of supervised release, they have at least as much force in the context of pretrial release. The *Williams* opinion drew its principles from Supreme Court opinions addressing pretrial and mid-trial—as well as post-conviction—conditions (*see supra* at 7), and its wording indicates that these principles apply with at least equal force in the pretrial context. *Williams*, 356 F.3d at 1055 (noting that effects of psychotropic medications are "as likely to impair individuals on supervised release as they are to affect prisoners and *pretrial detainees*") (emphasis added); *id.* (noting that "court-backed threat of renewed incarceration" impairs liberty interest as severely as mandate affecting incarcerated prisoner).

This conclusion is in any event logically inescapable. Unlike supervised releasees, who have been convicted and sentenced and whose due process right to liberty is "diminished," *Betterman v. Montana*, 578 U.S. 437, 448 (2016), pretrial releasees are "ordinary people who have been accused of a crime but are presumed innocent" and "have suffered no judicial abridgement of their constitutional rights." *United States v. Scott*, 450 F.3d 863, 871–72 (9th Cir. 2006). Moreover, the statutory standards governing pretrial conditions closely parallel those governing supervised release conditions. *Compare* 18 U.S.C. § 3142(c)(1)(B) (pretrial release conditions must be the "least restrictive" necessary to "reasonably assure" the releasee's appearance and community safety) *with* 18 U.S.C. § 3583(d)(2) (supervised release conditions must involve "no greater deprivation of liberty" than is "reasonably necessary" to achieve the purposes of supervised release).

It is equally plain that the *Williams* principles should apply to the fundamental liberty interest protected by the Second Amendment. Certainly this interest enjoys equal stature with the interests protected by *Williams* and its progeny. The Second Amendment right is "deeply rooted in this Nation's history and tradition," *McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010) (internal quotation marks omitted), and the right of self defense that it ensures has been described as "the first law of nature," *Heller*, 554 U.S. at 606 (internal quotation marks omitted). Indeed, the Second Amendment right is intertwined with the interests protected by cases such as *Napulou* and *Wolf Child*, inasmuch as one's interest in maintaining and enjoying connections of family and affection is closely connected to the desire to *protect* one's family members and life partners.

Another principle underlying the historical importance of the Second Amendment right—its role as a "strong moral check against the usurpation and arbitrary power of rulers"—is equally pertinent. *McDonald*, 561 U.S. at 770 (internal quotation marks omitted). If the government, armed with absolute prosecutorial immunity, *Imbler v. Pachtman*, 424 U.S. 409 (1976), may disarm its citizens virtually at will simply by charging them with crimes, this crucial function of the Second Amendment right may be stymied. *Cf. Stack v. Boyle*, 342 U.S. 1, 6 (1961) (warning that "[t]o infer from the fact of indictment alone a need for bail in an unusually high amount" would inject "principles of totalitarianism" into our system of government).

Here, notwithstanding these principles, the district judge affirmed the disarming of Mr. Fencl without finding that complete disarmament constituted the

10

"least restrictive" measure that would "reasonably assure" his appearance at trial and the safety of the community. Mem. Ex. A. Unfortunately, this is the norm in this Circuit. Mr. Fencl has shown that, in the Southern District of California, the Second Amendment right is stripped from pretrial releasees virtually across the board. Mem. Ex. B at 12–58. An informal survey of amici's offices confirms that the same practices are in effect across the Circuit. Pretrial releasees are routinely disarmed—generally with no discussion and no explanation of why their disarmament qualifies as the "least restrictive" measure necessary to reasonably assure their appearance at trial or the safety of the community. 18 U.S.C. § 3142(c)(1)(B). And this practice is largely impervious to the type of charge, affecting even those accused of the least violent—and least weapons-related—offenses imaginable. *See*, *e.g.*, *United States v. Lopez*, No. 21-cr-69 (D. Mont.) (Doc. 11 at 2) (bookkeeper charged with embezzlement); *United States v. Mosmiller*, No. 21-cr-84 (D. Mont.) (Doc. 13 at 2) (pharmacy technician charged with purloining hydrocodone pills); *United States v. Uziewe*, No. 20-cr-196 (E.D. Cal.) (Doc. 20 at 1) (owner of Christian bookstore charged with bank fraud).

    This practice contravenes this Court's precedent. For this reason, in addition to those that Mr. Fencl has articulated, the Court should reverse.

## Conclusion

For the reasons set forth above, in addition to those that Mr. Fencl has identified, this Court should reverse.

Respectfully submitted on January 11, 2023.

| | |
|---|---|
| JODI LINKER<br>Federal Public Defender<br>Northern District of California | JON M. SANDS<br>Federal Public Defender<br>District of Arizona |
| s/ *Carmen Smarandoiu*<br>CARMEN SMARANDOIU<br>Appellate Chief<br>450 Golden Gate Ave., 19th Floor<br>San Francisco, CA 94102<br>(415) 436-7700 | s/ *Daniel L. Kaplan*<br>DANIEL L. KAPLAN<br>Assistant Federal Public Defender<br>850 West Adams Street, Suite 201<br>Phoenix, Arizona 85007-2730<br>(602) 382-2767 |

## Certificate of Compliance

I certify that this brief:

(1) complies with the length limits set forth in FRAP 29(a)(5) and Circuit Rules 9-1, 27-1(1)(d), and 32-3(2) because it contains 2,744 words, excluding those exempted by FRAP 32(f); and

(2) complies with the typeface requirements of FRAP 32(a)(5), and the type style requirements of FRAP 32(a)(6), because it has been prepared in a proportionally spaced typeface using Equity Text B 14-point font.

s/ <i>Daniel L. Kaplan</i><br>
DANIEL L. KAPLAN<br>
Assistant Federal Public Defender